IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,
Plaintiff,
v.

CRIMINAL ACTION NO.
1:19-CR-00435-AT-RDC-3

WILLIAM RIVERS,
Defendant.

## **FINAL REPORT AND RECOMMENDATION**

This case is before the Court on Defendant William Rivers' three pending motions - Motion to Dismiss Indictment [Doc. 62], Motion to Suppress Statements [Doc. 105], and Supplemental Motion to Suppress Statements [Doc. 216]. This Court held an evidentiary hearing to receive evidence related to these motions on November 5, 2020. (R. 154). On January 27, 2021, Mr. Rivers filed a post-hearing brief in support of his motions. [Doc. 177]. The Government filed its response on March 8, 2021. [Doc. 190]. Mr. Rivers filed his reply brief on March 22, 2021. [Doc. 197].

On April 22, 2021, this Court directed the parties to submit supplemental

briefing regarding the validity of Mr. Rivers' *Miranda* waiver obtained during his first law enforcement interview following his arrest. (R. 206).  Mr. Rivers filed his supplemental motion on June 8, 2021. [Doc. 216]. The Government filed its response on July 8, 2021. [Doc. 221].  Mr. Rivers submitted his reply brief on July 16, 2021. [Doc. 223]. Following review of Defendant's pleadings, the Government's responses, and the transcripts of the evidentiary hearing [Doc. 175] (hereafter "Tr.") and the audio recording of Mr. Rivers' initial interview [Gov't Ex. 2] (hereafter "Interview Tr."), these matters are now ripe for judicial review.

**Factual and procedural background**

Mr. Rivers, along with Caojo Steward, Jeron George, Demetrius Lewis, and Montrese Goodwin are named in a ten count Indictment charging them with conspiracy to distribute controlled substances, attempted Hobbs Act Robbery, assault and various firearms offenses. [Doc. 36]. Mr. Steward is charged with distribution of a controlled substance on or about August 21, 2019 (Count 1) and on or about September 4, 2019 (Count 2).  *Id.*  Mr. Steward and Mr. George[1] are charged with conspiracy to distribute a controlled substance between a date unknown to the Grand Jury through on or about October 8, 2019 (Count 3) and possession with intent to distribute a controlled substance on or about October 8, 2019 (Count 4).  Mr. Steward, Mr. Rivers, Mr. Lewis and Mr. Goodwin are charged

---

[1]   All charges filed against Mr. George have now been dismissed upon motion of the Government. [1:19-CR-435-02; Docs. 195, 198].

with attempted Hobbs Act Robbery on or about October 8, 2019 (Count 5).  Lastly, Mr. Rivers, Mr. Lewis and Mr. Goodwin are charged in Counts 6-10 which allege unlawful possession of firearms and assault offenses that occurred immediately following the attempted robbery. *Id.*

This Indictment is based on a drug trafficking investigation conducted by agents with the Atlanta-Carolina's High Intensity Drug Trafficking Area Program ("HIDTA"). [Criminal Complaint, 1:19-MJ-876; Doc. 1 at 4]. The agents utilized a confidential source ("CS") to purchase cocaine from Mr. Steward, who lived in Apartment 209 located at 1090 Hollywood Road in Atlanta. On August 21 and September 4, 2019, the CS successfully purchased cocaine from Mr. Steward. *Id.*

On October 8, 2019, a third purchase was arranged between the CS and Mr. Steward. [Criminal Complaint at 4].  During this transaction, the CS agreed to purchase several ounces of controlled substances from Mr. Steward for $18,000. *Id.* at 5. Around 4:00 p.m., agents drove the CS to their meet location to prepare for the planned transaction, and then dropped the CS off at Hollywood Road and Brooks Avenue. *Id.* The CS walked to Mr. Steward's apartment where they discussed the transaction. *Id.* at 5-6.  After receiving a delivery from Mr. George that agents assumed contained narcotics,  Mr. Steward explained that he planned to cook "it" up (referring to the narcotics) and it would take approximately 30 minutes. *Id.*  Soon thereafter, agents observed the CS as he gave the pre-arranged verbal and visual

3

signals indicating he was in danger. *Id.* Mr. Rivers, Mr. Lewis, and Mr. Goodwin, who were armed, had begun attacking the CS and attempting to rob him of the $18,000. *Id.*

As agents arrived on the property to assist the CS, the three suspects ran away from the apartment, firing towards agents as they fled. [Criminal Complaint at 13]. Agents returned fire, striking Mr. Rivers in his left leg. Mr. Lewis and Mr. Goodwin ran from the area while Mr. Rivers returned to the apartment complex where he was arrested the next day - October 9, 2019. [Doc. 190 at 4].

Federal agents transported Mr. Rivers to Grady Memorial Hospital – a Level One Trauma Center – to ensure he received immediate medical care. (Tr. at 15). Once he was admitted into the emergency unit, Drug Enforcement Administration Special Agent Erin Holder informed the staff that he had been shot. (Tr. at 26). She also explained to Mr. Rivers that he had been involved in a shoot-out with law enforcement officers, but did not ask him any questions pertaining to the criminal investigation. *Id.*

A few hours after Mr. Rivers was admitted to Grady, Georgia Bureau of Investigation Special Agent Jamal Shedrick arrived at the hospital. (Tr. at 35). He intended to question Mr. Rivers about the circumstances surrounding the shooting. *Id.* However, after introducing himself and explaining the purpose of his visit, Mr. Rivers stated that he did not want to be interviewed because he was about to undergo

4

a surgical procedure. (Tr. at 35-36). According to Agent Shedrick,  he informed Mr.

Rivers he would return the following day.[2] (Tr. at 36).

On October 10, 2019, Agent Shedrick returned to the hospital.  In anticipation

of the interview, he activated his recording device.  Upon entering Mr. Rivers' room,

he asked a hospital attendant if he was awake. (Interview Tr. at 2). The attendant

---

[2]     The parties disagree about this portion of the discussion between Agent Shedrick and Mr.
Rivers.  According to the transcription of this conversation, Agent Shedrick stated "I know you told
me that you didn't want to talk about what happened…" (Interview Tr. at 3).  The Government
submits that Agent Shedrick actually stated: "I know you told me you **were wanting** to talk about
what happened…"[Doc. 221 at 2] (emphasis added). Mr. Rivers disagrees, arguing that the
government is attempting to improperly edit the conversation in order to undermine his claim that
he did not want to be interviewed, that the agent ignored his request for counsel and that the
government's interpretation of the transcript is an attempt "to bolster the conclusion that it did not
violate [his] Sixth Amendment right to counsel." [Doc. 223 at 3].

Whether Mr. Rivers refused to be interviewed initially is not relevant to his underlying
challenge to the validity of his subsequent *Miranda* waiver because agents are not barred from re-
initiating questioning of an accused at a later time if a prior interrogation has not commenced.
*United States v. Grimes*, 142 F.3d 1342, 1438 (11th Cir. 1998) (where court held agent's second
attempt to interrogate defendant was not unlawful because the initial interview had not commenced;
an accused's *Miranda* rights may be invoked only during custodial interrogation or when an
interrogation is imminent.).

In the instant case, the transcript (and the audio recording) reveal that Agent Shedrick merely
introduced himself and explained the purpose of his visit during this initial meeting. (Tr. at 36).
Because he did not interrogate Mr. Rivers during this exchange, he could lawfully return to attempt
an interview.  As for the accuracy of the transcript, the Court rejects the Government's suggested
interpretation of the Agent's statements. The Court acknowledges that the audio recording is
difficult to decipher at times. However, without a review of this disputed portion of the transcript
by the court reporter and an opportunity for Mr. Rivers to obtain his own independent review, the
Court will rely on the language contained in the Government's exhibit.

stated that Mr. Rivers had spoken to him ten minutes earlier, but was currently asleep and "full of pain meds." (Interview Tr. at 2).  In an attempt to rouse Mr. Rivers, the agent began calling his name. *Id.*  Mr. Rivers responded, although his voice suggested he was lethargic, weak or both. After receiving this verbal response, Agent Shedrick re-introduced himself and reminded him that he had spoken to him the previous day. (Tr. at 37-38).  He also explained that he wanted to conduct an interview. (Tr. at 38). Before asking Mr. Rivers any substantive questions about the alleged offenses, Agent Shedrick informed him of his *Miranda* rights. (Tr. at 39-40; Gov't Ex. 1).[3] After reciting these rights, Mr. Rivers asked him to explain how he could go about contacting an attorney. *Id.*  The Agent explained that it would be up to Mr. Rivers to contact a lawyer. *Id.* When Mr. Rivers stated that he did not have access to a telephone, Agent Shedrick replied: "If you want a lawyer to be present, then I would

---

[3]   The waiver of rights form, signed by Mr. Rivers and Agent Shadrick, states in part:

    1.  I have the right to remain silent.
    2.  Anything I say can be used against me in a court of law.
    3.  I have the right to talk to a lawyer and have him present with me while I am being questioned.
    4.  If I cannot afford a lawyer, one will be appointed to represent me before any questioning, if I wish.
    5.  I can decide at any time to exercise these rights and not answer any question or make any statement.

      I understand my rights.  Having these rights in mind, I am willing now to talk to a law enforcement officer.  I have not been threatened. I have not been promised anything. I have not been forced in any way to answer any questions or make any statements.

just have to wait until you are able to get a lawyer." (Interview Tr. at 4).  Following

that explanation, Mr. Rivers signed the waiver form. (Tr. at 42).  According to the

Agent, Mr. Rivers indicated that he understood his *Miranda* rights and voluntarily

waived them. (Tr. at 42, 44, 56).  During the 1½ hour interview that followed, Mr.

Rivers made several incriminating statements revealing his involvement in the

offenses that preceded his injury. (Tr. at 44-45). Agent Shedrick testified that Mr.

Rivers appeared to understand all of his questions and was able to provide coherent

responses. (Tr. at 38).

On the same day, D.E.A. Special Agent Michael Tooley and another agent

traveled to the Atlanta federal courthouse to meet with the federal magistrate judge

on duty. (Tr. at 16). The agents, along with Assistant United States Attorney Katherine

Terry, met with Magistrate Judge Catherine Salinas to inform her of Mr. Rivers'

medical condition and to determine how and when the court would conduct his initial

appearance hearing. (Tr. at 19-20). They also wanted to determine if the court would

prefer to conduct the hearing at the hospital or virtually. *Id.*

Judge Salinas contacted Chief Magistrate Judge Alan Baverman to discuss the

logistics of the hearing. (Tr. at 16).  Following her meeting with Judge Baverman,

Judge Salinas informed the agents that the initial appearance hearing would occur

only *after* Mr. Rivers was medically discharged from Grady. *Id.* She also stated that the hearing would not be conducted at the hospital nor via electronic means. *Id.*

Later that afternoon,  D.E.A. Special Agents Tyrone Lawary and Jeremy Jones arrived at the hospital to interview Mr. Rivers. (Tr. 64).  They identified  themselves, explained  why  they  were  present  and  asked  if  Mr.  Rivers  was  willing  to  answer questions related to  his arrest. (Tr. at 65-66).  The agents read the *Miranda* warnings from an "Advice of Rights" form. (Tr. at 73-74) [Gov't Ex. 3] [4]   But before the interview began, medical staff informed  Mr. Rivers that a CT scan needed to be performed. (Tr. at 67).  The interview was terminated until the examination could be completed.

Following that procedure, Mr. Rivers was returned to his room. *Id.*  The agents re-advised him of his *Miranda* rights. (Tr. at  72, 89 ).  When Mr. Rivers indicted that he was experiencing pain, the agents delayed their interrogation until after he received

---

[4]   The form read by the Agent provided:

    Your Rights.  Before we ask you any questions, do you understand: you have the right to remain silent. Anything you say can be used against you in court. You have the right to talk toa lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  Do you understand your rights? Are you willing to answer some questions?

    The form also included a Waiver of Rights provision that Mr. Rivers signed, along with Agents Jones and Lawary.

medication from his nurse. (Tr. at 67).  After a few moments,  Mr. Rivers  informed the agents that he was ready and able to proceed with the interview.  (Tr. at 67-68).

Mr. Rivers signed the *Miranda* waiver form and answered several questions regarding his involvement in the events leading up to the shooting and immediately following his injury. (Tr. at 65-66). Agent Lawary testified that Mr. Rivers appeared to understand their questions throughout the interview. (Tr. at 69). During the interview, the agents did not display their weapons. (Tr at 69-70).  Additionally, they did not restrain Mr. Rivers or prevent him from obtaining food, water or medical care. (Tr.  at 92).

Six days later, Mr. Rivers was interviewed for a third time. (Tr. at 99).  D.E.A. Special Agents Danae Busby, Michael Tooley and Kimbrell Dodder, along with Intelligence Analyst Kenneth Dunklee, arrived at Grady to question him about the circumstances of his arrest.  (Tr. at 100-101).  The agents identified themselves and informed Mr. Rivers of the purpose for their visit. (Tr. at 103-104).  Agent Busby advised Mr. Rivers of his *Miranda* rights by reciting them from DEA Form 13A. (Tr. at 105-106).  According to Agent Busby, Mr. Rivers appeared to understand his rights and confirmed that "….he understood.  He confirmed that he understood and said he wanted to help." (Tr. at 107).  He also indicated that he did not have any questions

concerning the rights he was waiving and did not request assistance of counsel. (Tr. at 107-108).

Agent Busby also testified that neither she nor the other agents threatened Mr. Rivers or displayed their weapons during the interview.  (Tr. at 108).  He was allowed to eat a meal and borrow an  agent's cellphone so that he would speak with a family member. (Tr. at 105-108; 129).

During the nearly three hour interview, Mr. Rivers described his involvement in the assault, identified photographs of other suspects and viewed a surveillance video of the incident.  (Tr. at 110-112).   Agent Busby testified that she believed Mr. Rivers' statements were voluntarily provided because "he had said on multiple occasions that he wanted to help and he even requested that the interview continue. And he asked to start over multiple times, and then he also asked to view a video that we had." (Tr. at 126).

Mr. Rivers was medically discharged on October 22, 2019. (Tr. at 133).   He appeared before Magistrate Judge John K. Larkins, III for his initial appearance on the criminal Complaint. (R. 21).  His motion for release on bond was denied and he was ordered to remain in custody pending resolution of  his case. [Doc. 27].   On November 5, 2019, he and his co-conspirators were indicted by the grand jury for the offenses described above. [Doc. 36].

### The parties' contentions

In Mr. Rivers' motion seeking dismissal of the Indictment, he claims dismissal with prejudice is justified "based upon the government's strategic decision to delay [his] initial appearance." [Doc. 62 at 1].  According to Mr. Rivers, the Government "leveraged" his need for medical care "to detain and repeatedly interrogate him at Grady Hospital." *Id.*  Primarily relying on Rule 5(a) of the Federal Rules of Criminal Procedure, *Coleman v. Frantz,* 754 F.2d 719 (7th Cir. 1985) and *Jackson v. Hamm*, 78 F.Supp.2d 1233 (M.D. Ala. 1999), he asserts that the delay in his presentment to a magistrate judge was unnecessary and solely motivated by the Government's intent to obtain incriminating evidence.  [Doc. 197 at 1-2].  He also moves to suppress that evidence -  the numerous statements  he made  while hospitalized. [Doc. 105].  He submits that the statements are inadmissible because they were obtained in violation of *United States v. Miranda*, 384 U.S. 436 (1966) and *Missouri v. Seibert*, 542 U.S. 600 (2004). *Id*. at 2.   Mr. Rivers claims all of his statements were involuntarily obtained because the statements were obtained following a surgical procedure and the administration of  medications.  [Doc. 177 at 2-3].  Because he "had been shot, was in pain, and medicated," he argues that the waivers of his *Miranda* rights were not provided knowingly, voluntarily, or intelligently. [Doc. 177 at 4].   Mr. Rivers also asserts that the statements he made during his initial interview with Agent Shadrick

should be suppressed because "the government ignored his request for counsel, conducted an illegal interview, and violated his Sixth Amendment right to counsel." [Doc. 216 at 1].

The Government urges this Court to deny all three motions, arguing that the delay in Mr. Rivers' presentment was not a calculated attempt to unlawfully obtain evidence, but a necessary delay based on his on-going need for medical care. [Doc. 190 at 14-15]. It also asserts that dismissal of the Indictment is not a recognized remedy for Fed. R. Crim. P. 5(a) violations. *Id.* at 11-12. As for Mr. Rivers' motions to suppress, the Government claims that "the totality of the circumstances demonstrate [he] made an uncoerced choice with the requisite level of comprehension" when he waived his *Mirada* rights, and that his waivers were "voluntary, knowing and intelligent." *Id.* at 24. Regarding Mr. Rivers' claim that Agent Shadrick committed an *Edwards* violation, the Government argues that he never invoked his right to counsel following the recitation of his *Miranda* rights. [Doc. 221 at 1]. Because it claims Mr. Rivers did not "unequivocally and unambiguously invoke either his right to counsel or his right to remain silent," his motion to suppress these statements should be denied as well. *Id.* at 6.

In rebuttal, Mr. Rivers re-iterates his claim that his delayed appearance before a magistrate judge was not based on his need for medical care, but the Government's

strategic ploy to circumvent Fed. R. Crim. P. 5(a) in order to subject him "to repeated, multi-day custodial interrogation." [Doc. 197 at 2]. This alleged misconduct, he submits, warrants dismissal of the Indictment and suppression of the statements obtained before his initial appearance. [Doc. 197 at 5-6].   He also claims the Government's attempt to "alter[] the operative fact (the desire by Mr. Rivers to obtain counsel)" should be rejected because the transcript of the initial interview supports his assertion that he unequivocally indicated that "he wanted (but could not contact) a lawyer." [Doc. 223 at 2].   Agent Shadrick's failure to end the interview as required by *Miranda* and its progeny, he argues, mandates suppression of his statements.

## Discussion

A. Fed. R. Crim. P. 5(a) violations do not warrant dismissal of an Indictment

Rule 5(a) of the  Federal Rules of Criminal Procedure requires an arresting officer to "take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officers empowered to commit persons charged with offenses against the laws of the United States."  The purpose of this Rule – often referred to as the "prompt presentment rule" or the *McNabb-Mallory* rule – is to ensure that a judicial officer advises a defendant of her constitutional rights and to prevent administrative detention without probable cause. *Mallory v. United States*, 354 U.S. 449 (1957).  This Rule was also adopted to prevent oppressive police

interrogations before an accused appears before an officer of the court; ordering exclusion of evidence obtained during the delay if it was gained by use of "third-degree" tactics; *Mallory,* 354 U.S. at 451-54; *McNabb v. United States*, 318 U.S. 332 (1949)("to permit such evidence to be made the basis of a conviction in the Federal courts would stultify the policy which Congress has enacted into law"); *Corley v. United States*, 556 U.S. 303, 310 (2009) (where court noted that the *McNabb-Mallory* rule "generally renders inadmissible  confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a)"); See also, *United States v. Mendoza*, 473 F.2d 697,702 (5ᵗʰ Cir. 1973)(" a violation of the rule renders the evidence obtained per se inadmissible").

Moreover, the Supreme Court has also explained that, pursuant to Section 3501(c) :

> a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and ... the weight to be given [it] is left to the jury." *Ibid.* If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

*Corley*, 556 U.S. at 322.

The burden of establishing that the delay in presentment is unreasonable lies with the Defendant. See *Miller v. United States*, 396 F.2d 492, 496 (8th Cir. 1968); *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956).

In the instant case, Mr. Rivers argues that the Government's "strategic decision to catch [him] in the maw of this repeated, comprehensive, and multi-day custodial interrogation" amounted to a Constitutional violation that compels dismissal of the Indictment with prejudice. [Doc. 197 at 5]. However, as Supreme Court precedent instructs, the remedy for a violation of Fed. R. Crim. P. 5(a) is exclusion of evidence obtained during the delay in presentment. *Mallory,* 354 U.S. at 453 . Likewise, as the Government noted, the Eleventh Circuit has held that a violation of this rule "renders the evidence obtained per se inadmissible." *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973)[5].  Thus, Mr. Rivers' request that this Court dismiss the Indictment based on an alleged "prompt presentment" violation despite this unequivocal precedent should be **DENIED.**

---

[5]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

B. <u>Delay in presentment to the Magistrate Judge was not unreasonable</u>

"When determining whether a violation of Rule 5 has occurred, courts consider the reasons for the delay, including factors such as the availability of a committing magistrate, the length of the delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay." *United States v. Harrold*, 679 F.Supp.2d 1336, 1352-52 (N.D. Ga. 2009) (Thrash, J.)(citation and internal marks omitted). "Delays so that the arrestee can receive medical care and/or sober up have also been sanctioned." *United States v. Boche-Perez*, 755 F.3d 327, 337 (5th Cir. 2014); *United States v. George*, 987 F.2d 1428, 1431 (9th Cir. 1993) (delay resulting from hospital care considered reasonable); *United States v. Johnson*, 352 F.Supp.2d 596, 597-98 (D. Maryland 2005) (same).

In the case at bar, Mr. Rivers asserts that "no legitimate justification [for the delay] appears to be advanced by the government, except the need for medical care." [Doc. 62 at 5].  Because Mr. Rivers eventually appeared before Judge Larkins "in a wheelchair with a bandaged leg," he submits that any argument that his physical impairments justified the delay in presentment is specious at best. *Id.*

The Government refutes these allegations, noting that Mr. Rivers' injury was so severe that medical practitioners determined surgery was required. [Doc. 190 at 4-5]. It also emphasizes that any suggestion that it attempted to circumvent Fed. R. Crim.

P 5(a)'s presentment requirement is belied by the fact that their agents contacted the duty magistrate judge the day after Mr. Rivers' arrest to inform her of his hospitalization and obtain guidance in securing an initial appearance hearing.

This Court agrees with the Government.  Mr. Rivers was suffering from a severe gunshot wound at the time of his arrest.  According to Agent Shedrick,  he was unable to interview Mr. Rivers on October 9th because the severity of his injury necessitated surgery. The next day, federal agents (along with AUSA Terry) met with Magistrate Judge Salinas to inform her of Mr. Rivers' serious medical condition and continued hospitalization.  They were also seeking direction on when Mr. Rivers should be transported to the courthouse for his initial appearance or  whether the court preferred to conduct the hearing at the hospital or virtually. Upon consultation with Chief Magistrate Judge Baverman, Judge Salinas informed the agents that the initial appearance would be conducted at the courthouse *only after* Mr. Rivers was discharged from Grady by hospital officials. In accordance with Judge Salinas' instructions, the agents transported Mr. Rivers to the courthouse upon his discharge from Grady to make his initial appearance on the then-pending criminal Complaint. The agents sought guidance from the court, promptly informed Judge Salinas of Mr. Rivers' medical condition, and complied with her directives. Their efforts to comply

with  the *McNabb-Mallory* Rule are persuasive proof of their intent to present Mr.

Rivers to the court as soon as possible.

   Mr. Rivers' suggestion that a two week delay in his presentment was

unnecessary because (in his view) the medical providers only "needed to bandage the

injury" is a baseless assumption wholly unsupported by the record.[6]   As previously

noted, it is Mr. Rivers' burden to establish that the delay in presentment was

unnecessary or unreasonable.   Mere speculation concerning the necessity of his

extended hospitalization fails to prove the delay was unnecessary. The fact that Grady

officials did not discharge him until 14 days later does not prove the Government

---

[6]    On January 6, 2020, Mr. Rivers moved this Court to deny the Government's request for issuance of subpoenas [Doc. 68] to obtain his medical records from Grady Memorial. [Doc. 69].  The Government requested the disclosure of "the complete medical record relating to the medical condition, examination, diagnosis, prognosis, and treatment of [the defendant] between on or about October 9, 2019 and on or about October 22, 2019." [Doc. 68 at 3].  It submitted that "good cause" existed justifying issuance of the proposed order because the medical records were "necessary to address the reasonableness of the delay in conveying [the defendant] to a magistrate judge for presentment" in response to Defendant Rivers' pending Motion to Dismiss. *Id.*

   Mr. Rivers objected, arguing that disclosure of his confidential records would result in an unreasonable violation of his privacy, stating: "The government does not need Mr. Rivers' medical records to answer the question of why it engaged in improper custodial interrogation for two weeks, i.e. Mr. Rivers' complaint involves the strategic delay that emanated from the improper interrogation, not any necessary medical care." [Doc. 69 at 2]. This Court agreed that disclosure was not justified and denied the Government's request. [Doc. 132]. Thus, no medical records could be produced by the Government to substantiate the severity of Mr. Rivers' injury, the medical justification for the length of his hospitalization nor the types and amounts of pharmaceuticals he was administered during his stay.  Moreover, Mr. Rivers has failed to provide evidence specifying the course of treatment he received while hospitalized to support his assertions of error.

attempted to delay his presentment to gain a tactical advantage or that the medical care Grady caregivers chose to provide resulted in an unnecessary delay.  Because Mr. Rivers has failed to prove that the delay in his presentment was unnecessary or unreasonable, his Motion to Dismiss Indictment [Doc. 62] should be **DENIED.**

      C. <u>Contradictory *Miranda* warnings require suppression of Rivers' statements</u>

Before the government may introduce a suspect's uncounseled statement made during custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination"); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988); *Dunkins v. Thigpen,* 854 F.2d 394, 398 (11th Cir. 1988). This showing has two distinct aspects: (1) relinquishment of the right must have been the product of a suspect's free and deliberate choice (rather than intimidation, coercion, or deception), and (2) the waiver must have been made with the full awareness of both the rights being abandoned and the consequences of the decision to abandon those rights. *Dunkins*, 854 F.2d at 398 (citing *Moran v Burdine*,

475 U.S. 412 (1986)); <u>See</u>, *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)(it is impermissible for authorities "to reinterrogate an accused in custody if he has clearly asserted his right to counsel"); <u>See</u> also, *Moran*, 475 U.S at 433 ("[T]he interrogation must cease until an attorney is present *only* [i[f the individual states that he wants an attorney)(citation and internal quotation omitted).

In *Miranda*, the Supreme Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. To prevent any compulsion, and protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposes on law enforcement officers an obligation to follow certain procedures in this context. Specifically, prior to the initiation of questioning, they must fully apprise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." *Id.* at 468-70. Although the Supreme Court has held that the police do not have to recite the *Miranda* warnings in a talismanic fashion, the warnings must not be misleading. *California v. Prysock*, 453 U.S. 355 (1981). <u>See</u>, *e.g., United States v. Dohm*, 618 F.2d 1169, 1175 (5th Cir. 1980) (en banc) (holding magistrate's warning "you may say something that might hurt you in the future" to defendant testifying

without counsel at bail bond hearing insufficient for valid *Miranda* waiver); *United States v. Womack,* 542 F.2d 1047 (9th Cir. 1976) (holding waiver invalid where law enforcement officers' conduct negated their assertion that defendant had a right to counsel).

Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Miranda*, 384 U.S. at 473-74.  A defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that a suspect's *Miranda* rights have been waived. *Moran*, 475 U.S. at 421; *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995); See also, *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979).

Aside from the dictates of *Miranda*, before a confession is admissible, the Court must find that it was voluntarily made. *Jackson v. Denno*, 378 U.S. 368, 378 (1964)

("[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession[.]"). Whether a statement was voluntarily given must be examined in light of the totality of the circumstances, <u>See</u> *Schneckloth,* 412 U.S. at 226; *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005); *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003); and includes factors such as whether: (1) law enforcement provided *Miranda* warnings, <u>See</u> *Beckwith v. United States*, 425 U.S. 341, 348 (1976); (2) the interrogation lasted for a lengthy period of time, *Davis v. State of North Carolina*, 384 U.S. 737, 752 (1966); *Thompson*, 422 F.3d at 1296; (3) the defendant was mature; (4) law enforcement relied on misrepresentations that induced the incriminating statements, *Frazier v. Cupp*, 394 U.S. 731,739 (1969); *United States v. Mitchell*, 966 F.2d 92, 100 (2nd Cir. 1992); (5) law enforcement used force and threats of force, *Thompson*, 422 F.3d 1296; and (6) law enforcement made promises to induce the confession, *Thompson*, 422 F.3d at 1296; *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) *overruled on other grounds by Arizona v. Gant,* 556 U.S. 332 (2009). This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir. 1989); *Hubbard v. Haley,* 317 F.3d 1245, 1252 (11th Cir. 2003).   However, while the

Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez,* 71 F.3d at 828 (citations omitted)*.* In other words, courts examine whether the interview was coercive. *Id*.; See also*, Thompson*, 422 F.3d at 1296 ("Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment."). Further, "'[t]he government bears the burden of proving ... that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" *United States v. Hildago*, 7 F.3d 1566, 1571 (11th Cir.1993) (quoting *United States v. Blake*, 888 F.2d 785, 798 (11th Cir. 1989).  With these principles in mind, the undersigned turns to the errors alleged by Mr. Rivers.

### 1. __Mr. Rivers' initial interview__

Agent Shadrick initially attempted to interview Mr. Rivers on the morning of his surgery. Because the surgical procedure was imminent, Mr. Rivers informed Agent Shadrick that he did not want to be interviewed at that time.  Agent Shadrick agreed to postpone the interview and explained that he would return the next day.  On October 10th, Agent Shadrick returned to the hospital. He activated his recording device that captured his conversation with a Grady employee:

S.A. SHADRICK: It is Thursday, October 10, 2019.   Time is approximately 11:26 A.M.   Special Agent Shadrick located at Grady Memorial Hospital, Room 6-A-12, in reference to attempt to conduct a subject interview in relation to an officer involved shooting investigation requested by the D.E.A. Is he awake?

UNKNOWN MALE: Probably not.   He's full of pain meds.

S.A. SHADRICK: Is he able to talk?

UNKNOWN MALE: He talked to me about ten minutes ago.

S.A. SHADRICK: Okay.

UNKNOWN MALE: Sounded competent.

S.A. SHADRICK: All right.   *[indiscernible]*

UNKNOWN MALE: Yeah, yeah, yeah.

(Interview Tr. at 2).

Following that exchange, Agent Shadrick attempted to rouse Mr. Rivers in order to conduct the interview:

S.A. SHADRICK: William?   What's up, man?

MR. RIVERS: How you doin'?

S.A. SHADRICK: You remember me?   I said do you remember me?

MR. RIVERS: Hm-mm *[negative]*.

S.A. SHADRICK: I came and spoke with you yesterday.

MR. RIVERS: *[indiscernible]* yesterday.  Yesterday?

S.A. SHADRICK: Yesterday morning.

MR. RIVERS: Yeah.

S.A. SHADRICK: Right before you were going into surgery.

MR. RIVERS: *[indiscernible]*

S.A. SHADRICK: Yeah.   You remember me now?

MR. RIVERS: Yes, sir.

S.A. SHADRICK: Okay. I know you told me that you didn't want to talk about what happened and I told you I would come back tomorrow which is today. Are you still willing to talk about what happened?

MR. RIVERS: It's all good.

(Interview Tr. at 2-3).

After Mr. Rivers seemed to indicate he was willing to submit to questioning, Agent Shadrick recited these warnings from a written form:

S.A. SHADRICK: Okay.   I'll just hold it for you.   So, basically this is the form, date and time, your name, your address,   age, you completed the twelfth grade in school.   You know that this is me, as  a  Special Agent of the

Georgia Bureau of Investigation. So, these are your rights.   You have the right to remain silent.   Anything you say can be used against you in a court of law.   You have the right to talk to a lawyer and have him or her present with you while you're being questioned.   If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.   You can decide at any time to exercise these rights and not answer any questions or make any statements.   Do you understand these rights?   Having these rights in mind, you are willing to talk to a law enforcement officer, which would be me.   You have not been threatened.   You have  not been promised anything.   You have not been forced in any way to answer any questions or make any statements.   If you agree, just print your name right there.   Or sign your name right there.

MR. RIVERS: How do I go about –

S.A. SHADRICK: How do you go about what?

MR. RIVERS: Talk to a lawyer.   I can't make no phone calls.

S.A. SHADRICK: I mean if you -- if you have a lawyer that you wish to talk to, do you -- you can just contact them, I guess.

MR. RIVERS: I'm saying how?   They wouldn't make no phone call.

S.A. SHADRICK: If you want a lawyer to be present, then I would just have to wait until you are able to get a lawyer.

26

MR. RIVERS: Mm-hm *[affirmative]*.

(Interview Tr. at 3-4).

After a brief moment of silence, Agent Shadrick began the interview.   Mr. Rivers made several incriminating statements during the 1½  hour interview.

Mr. Rivers contends that these statements were obtained in violation of *Miranda* and *Edwards* because he unequivocally invoked his right to counsel when he asked the agent to explain how he could contact an attorney.   He also argues that his statements were not voluntarily surrendered because "the testimony at the hearing, Mr. Rivers' statements were not knowing, voluntary, or intelligent. He had been shot, was in pain, and medicated." [Doc. 177 at 4].

The Government disagrees, asserting that Mr. Rivers did not make an unambiguous request for counsel:

> Although [defendant] questioned how he could talk to a lawyer without access to a phone, perhaps asking for advice or information, Rivers did not ask to speak to a lawyer, did not express that he wanted to talk [to] a lawyer prior to or during questioning, and did not request to have a lawyer contacted on his behalf.

[Doc. 221 at 6].

 This failure to unambiguously invoke the right counsel, it submits, did not result in an *Edwards* violation. This Court agrees. Mr. Rivers' statements were questions regarding *how* he could contact an attorney. He did not request to have an attorney

appointed to represent him or that the interview be delayed while he attempted to retain counsel. A suspect must unambiguously request counsel and "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the law enforcement officers stop questioning the suspect." *Davis v. United States*, 512 U.S. 452, 452 (1994).  Therefore, Mr. Rivers' failure to clearly assert his right to counsel dooms his claim that an *Edwards* violation has occurred.

The same does not hold for true Mr. Rivers' claim that he did not knowingly, voluntarily and intelligently waive his *Miranda* rights. The record offers ample support for this claim. As noted above, Mr. Rivers asked Agent Shedrick how he would you be able to "talk to a lawyer." Agent Shedrick replied that "if you have a lawyer that you wish to talk to, do you – you can just contact them, I guess."  When Mr. Rivers explained that he did not have access to a telephone and that "they" (presumably hospital staff) would not make calls on his behalf, Agent Shadrick  stated that if  he wanted an attorney to be present he "would have to wait **until you are able to get a lawyer.**" (Interview Tr. at 4) (emphasis added).  Although Agent Shedrick previously informed Mr. Rivers of his right to request appointment of counsel, the Agent's subsequent statements indicated that Mr. Rivers would have to retain a

lawyer on his own. This advice is problematic because it contradicts *Miranda*'s guarantee that provides: "If I cannot afford a lawyer, one will be appointed to represent me before any questioning, if I wish." [Gov't Ex. 1].

"Miranda warnings must not be misleading." *United States v. Ramirez*, 991 F. Supp. 2d 1258, 1269 (S.D. Fla. 2014).   This Circuit has found that an officer's statements that confuse a suspect or contradict an express part of the *Miranda* warnings warrant suppression of the incriminating statements. *United States v. Beale*, 921 F.2d 1412, 1335 (11th Cir. 1991) (where appellant court found agents' advice "contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent"); *Hart v. Attorney General of the State of Florida*, 323 F.3d 884 (11th Cir. 2003)(court found detective's deception and contradictory statements prevented defendant from understanding his right against self-incrimination and the consequences arising from that waiver. Thus, it concluded defendant's waiver "was not voluntary, knowing and intelligent as required by *Miranda*").   Likewise, in the instant case, Agent Shedrick's advice to Mr. Rivers that he would have to obtain his own attorney if he wanted legal representation was misleading and contradictory. This advice, paired with Mr. Rivers' fragile physical state, undermines any suggestion that the waiver of his *Miranda* rights was knowing,

voluntary or intelligent.  As the audio recording reveals, Mr. Rivers was lethargic when Agent Shedrick arrived the morning following his surgery.  He had been heavily sedated before the interrogation began.  He was so physically weak he could barely sit upright in his bed without assistance. He exhibited difficulty in recalling the day of the week and whether he had met the Agent on the previous day.  As he attempted to answer the Agent's routine background questions, it became apparent that he was confused. "[F]ull comprehension of the rights to remain silent and request an attorney" are required to establish that a defendant's *Miranda* waiver was voluntary. *Moran*, 475 U.S. at 427. In consideration of the totality of these particular circumstances, the Government has failed to establish by a preponderance of the evidence that Mr. Rivers' waiver was knowing, voluntary or intelligent.  Therefore, the undersigned recommends that Mr. Rivers' Supplemental Motion to Suppress Statements [Doc. 216] be **GRANTED.**

## 2.  Mr. Rivers' 2nd and 3rd interviews

As previously explained, the government must "prove by a preponderance of the evidence that the defendant made a knowing, voluntary and intelligent waiver of his *Miranda* rights." *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005) (*per curiam*). "A written waiver 'is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.' " *United States v.*

*Rafael Guerrero*, 296 Fed. App'x 764, 766 (11th Cir. 2008) (quoting *North Carolina v Butler*, 441 U.S. 369, 373 (1979).) However, a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. *Miranda*, 384 U.S. at 475. "[T]he determination of whether there has been an intelligent waiver ... must depend in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938); See *Miranda,* 384 U.S. at 475, (applying *Johnson v. Zerbst* standard to waiver of *Miranda* rights); *Miller v. Dugger, 838 F.2d at 1537-398* (same). The ultimate question of the validity of a suspect's waiver of his *Miranda* rights is " 'a legal question requiring an independent federal determination.' " *Lindsey v. Smith,* 830 F.2d 1137, 1150 (11th Cir. 1987).

In the instant case, Mr. Rivers moves to suppress the statements he provided in two subsequent interviews that were also conducted while he was hospitalized. He argues that the testimony provided during the evidentiary hearing proves that the statements he made "after having been shot and in pain, were not knowing, intelligently, and voluntarily [made]," notwithstanding the signed *Miranda* waivers. [Doc. 177 at 3-4]. The Government disputes this claim as well. According to their agents, Mr. Rivers understood all of their questions and provided coherent answers

despite his injury and fact he was often medicated during the interviews. [Doc. 190 at 21]. The Government submits that Mr. Rivers' "decision to waive his *Miranda* rights was a free and deliberate decision on each occasion," emphasizing that the D.EA. agents did not make any promises to entice him to cooperate, did not threaten him nor display their weapons. [Doc. 190 at 18-19]. It also emphasizes that the agents did not employ any interrogation tactics involving deception in order to obtain the incriminating statements. *Id.* These non-confrontational interviews, it argues, prove that Mr. Rivers' decisions "to speak with the agents after being advised of and waiving his *Miranda* rights, should therefore be considered an act of free will." *Id*. at 19.

The Government's arguments are well taken. Prior to making his statements, Mr. Rivers was fully advised of, and waived in writing, his *Miranda* rights. At the time of the interviews, Mr. Rivers was 28 years old and had completed the 12th grade. During both interviews, he acknowledged that he understood his rights and was willing to submit to questioning from the agents. The agents did not use any physical force against him, nor did they make any threats or promises to influence his decision to surrender his rights. Although armed, they never removed their weapons from their holsters. Additionally, Mr. Rivers was not shackled to his bed nor handcuffed during any of the interviews. And except for the emotion he expressed when he was allowed to use one of an agent's cellphone to speak to his family members, he did not appear to be under emotional distress. Both  sessions were

conducted in conversational and non-confrontational tones, with Mr. Rivers providing narrative summations of the events leading to his arrest. He coherently described his involvement in the criminal acts that preceded his arrest, even admitting feeling remorse for the assault on a bystander. There is no indication that Mr. Rivers' will to remain silent and refuse to make a statement was overborne. His willingness to submit to the interviews, coupled with the non-threatening manner in which each of the interviews was conducted, establishes that his statements were not obtained in violation of *Miranda*.

In addition to these factors, the timing of the interviews cuts against Mr. Rivers' argument that he did not have the capacity to voluntarily waive his *Miranda* rights. The second interview occurred several hours after his surgery.  Mr. Rivers did not undergo any additional surgical procedures and has not shown that the medications he was prescribed impeded his ability to comprehend.  The third interview occurred six days after his surgery. This attenuation between his surgical procedure and the waivers of his *Miranda* rights undermines his argument that his physical ailments necessarily prevented him from making voluntary statements. See, *United States v. Lewis,* 833 F.2d 1380, 1384–84 (9th Cir. 1987) (where court noted the demonstrated attenuation between the defendant's surgical procedure and the commencement of the interrogation undermined her argument that her statements were involuntary: "Twenty-four hours elapsed between the time of the first conversation and Lewis'

confession on October 22, 1986. The agents had no contact with Lewis during this time").

Based on these facts, this Court simply cannot find that Mr. Rivers' statements were involuntarily made because he was enduring pain or discomfort as a result of his injury. See, e.g. *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (finding that the defendant voluntarily waived *Miranda* despite pain because he responded coherently to questions, gave responsive answers, and was not unconscious or incoherent during questioning, noting that "a defendant can voluntarily waive his *Miranda* rights even when he is in the hospital, on medication, and in pain")(gathering authority); *United States v. Martin,* 781 F.2d 671, 673–74 (9th Cir.1985) (holding statements voluntary even though defendant was under the influence of Demerol and was still in pain).

The objective indicators in this case establish Mr. Rivers was informed in clear and unequivocal terms of each of his *Miranda* rights and stated or indicated by his conduct that he understood them and wished to waive them. Instead, the evidence shows that Mr. Rivers made free and deliberate choices to disclose his involvement in the alleged offenses. Although he was recovering from a serious injury and experienced pain and discomfort as a result, there is no evidence that his physical ailments prohibited him from understanding and knowingly waiving his *Miranda*

rights in this 2nd and 3rd interviews. Thus, the undersigned recommends that Mr. Rivers' motion to suppress the statements he provided during his second and third interrogations [Doc. 105] be **DENIED.**

## CONCLUSION

For the reasons stated above, this Court **RECOMMENDS** that Mr. Rivers' Motion to Dismiss Indictment [Doc. 62] be **DENIED**, Motion to Suppress Statements [Doc. 105] be **DENIED,** and his Supplemental Motion to Suppress Statements to **GRANTED**. [Doc. 216].

Having now addressed all referred pretrial matters relating to Mr. Rivers and having not been advised of any impediments to the scheduling of a trial as to him, this case is **CERTIFIED READY FOR TRIAL** as to Mr. Rivers.

**IT IS SO RECOMMENDED** this 10th day of August, 2021.

REGINA D. CANNON
United States Magistrate Judge